[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-11165
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 22, 2010
JOHN LEY
ACTING CLERK

Agency No. A097-951-791

JEWAN DAT,
a.k.a. Yudhishtira Sawh,

                                                        Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                        Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(January 22, 2010)

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Jewan Dat, a native and citizen of Guyana, petitions us for review of the

Board of Immigration Appeals' ("BIA") decision denying his motion to reopen his previously denied application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3), and relief under the United Nations Convention Against Torture, and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). After careful review, we DENY the petition.

## I. BACKGROUND

Upon entering the United States in April 2004 with a fraudulent passport and I-551 alien registration card, Dat was issued a Notice to Appear charging him with removability under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i). Administrative Record ("AR") at 304-05. Dat conceded removability at an initial hearing before an immigration judge ("IJ") on 18 May 2004. Id. at 148-49. On 17 August 2004, Dat formally applied for asylum, withholding of removal, and CAT relief. Id. at 152-53; 274-83.

In his application, Dat sought relief based on his race and political opinion. Id. at 278. He alleged that in 2001, three Afro-Guyanese individuals approached him as he was going to vote, assaulted him, and threatened to kill him if he voted for a member of the People's Progressive Party ("PPP"). Id. In 2002, three Afro-Guyanese men threw stones at his home, shouted epithets, and demanded that he leave the county. Id. Dat also alleged that he was stabbed in 2003 and robbed

2

in 2004. During both attacks, his assailants threatened to kill him because he was Indian. Id. at 278, 283. Dat stated that he left Guyana because he feared the Afro-Guyanese would kill him on account of his race and "assumed political affiliation" if he remained. Id. at 283.

Dat submitted multiple documents in support of his application, including letters from family members corroborating his claims of assault and intimidation, two newspaper articles from 2002 and 2004 describing the mistreatment of Indians in Guyana, and a 2004 United States Citizenship and Immigration Services ("USCIS") information sheet detailing the treatment of "criminal deportees to Guyana." Id. at 193-96, 211-14, 270-72. The information sheet noted that Guyanese laws permitted criminal deportees to be placed under surveillance and that government officials allegedly hired "hit squads" to assassinate some suspected criminals. Id. at 213. Amnesty International articles also described these killings and noted that Indo-Guyanese citizens were disproportionately affected by violent crime in Guyana. Id. at 215-16, 218.

The record also contains the 2004 U.S. Department of State Country Report on Human Rights Practices for Guyana. The report noted that Guyana has a multiparty political system and that the PPP was reelected in 2001 in what the report described as a "generally free and fair national election." Id. at 198. The report further indicated that "longstanding ethnic tensions" between Guyanese of

3

Indian and African descent had led to "incidents of discrimination" and that although both racial groups waged propaganda attacks on one another, the civil service and security forces were "overwhelmingly staffed by Afro-Guyanese." Id. at 198, 206.

At the 10 February 2006 hearing on Dat's application, Dat testified that he belonged to the PPP when he lived in Guyana and that he received threats from the Afro-Guyanese opposition party as a result of his membership. Id. at 167-68. He testified regarding the assaults he had alleged in his application and stated that if he returned to Guyana he would be killed "[b]y the African guy" because he is Indian. Id. at 181. On cross-examination, Dat stated that he did not have medical records or police reports confirming the assaults, and admitted that his family had not been threatened or harmed since he left Guyana. Id. at 182-84.

The IJ issued an oral decision denying Dat's application after finding that Dat was not active in the PPP and had provided no evidence that he experienced problems "because of [his] limited activity in support of the PPP." Id. at 142. The IJ found that although racial tensions existed between the Indo- and Afro-Guyanese populations, Dat's experiences did not rise to the level of persecution. Id. at 143-44. Dat appealed the IJ's decision to the BIA on 13 March 2006. Id. at 132.

While his appeal was pending before the BIA, Dat married a U.S. citizen and

filed with the BIA a "motion to terminate proceedings," in which he sought an adjustment of status based upon his marriage. Id. at 93-94, 109-10. Citing proposed amendments to the federal regulations governing eligibility for adjustment of status, Dat claimed that he should be permitted to pursue adjustment of status before an IJ. Id. at 95. Dat argued in the alternative that he should be granted refugee status based on his well-founded fear of persecution if returned to Guyana. Id. at 95-97.

On 9 August 2007, the BIA issued a decision adopting and affirming the IJ's decision and holding that Dat had failed to establish eligibility for asylum, withholding of removal, or CAT relief. Id. at 83. The BIA also denied Dat's motion to terminate the proceedings after finding that Dat did not fit within the "narrow exception that would permit an [IJ] to consider his application for adjustment of status." Id. at 84. The BIA dismissed Dat's appeal accordingly. Id.

On 7 January 2009, Dat moved the BIA to reopen his removal proceedings based on changed country conditions, arguing that racial violence in Guyana was "out of control." Id. at 32, 34, 37-38. Dat stated additionally that USCIS had denied his request for an adjustment of status and asked the BIA to remand the case to an IJ so that the IJ could "administratively close the case pending the decision of the administrative appeals unit regarding adjustment of status relief." Id. at 32-33.

Dat submitted several documents in support of his motion to reopen, including: (1) a BBC News report and two additional BBC articles detailing a mass murder in a Guyanese village that, according to the Guyanese president, "may have been meant to stir up ethnic tension" in the mostly Indian village; (2) an "issue paper" prepared by the Canadian Immigration and Refugee Board noting a lack of consensus over "whether the Indo-Guyanese are disproportionately victimized in criminal situations"; (3) two articles describing a gang attack on a police station; and (4) a news release from the Guyana Government Information Agency reporting on an "upsurge in crime" and the government's plans for dealing with it. Id. at 48-49, 50-55, 58-59, 60-67, 75-79.

Finally, Dat submitted the 2008 United States Department of State Country Report on Human Rights Practices for Guyana. The 2008 report was largely identical to the 2004 report, except that it omitted the 2004 report's introductory clause concerning discrimination based on Indo-Guyanese ethnicity. See id. at 68. The 2008 report indicated that "[r]acial and ethnic tensions manifested during the 2006 election campaign [had] diminished" and that "[t]he Ethnic Relations Commission [had] resolved 50 cases involving complaints of discrimination against members of racial or ethnic minorities." Id. at 72.

On 9 January 2009, Dat filed a motion to stay removal proceedings pending the BIA's decision on his motion to reopen. Id. at 8. In its 17 February 2009

6

decision, the BIA first found that Dat's motion was untimely because it was filed more than ninety days after entry of its 9 August 2007 order dismissing his appeal. Id. at 2; see INA § 240(c)(7)(C)(i) (2009); 8 U.S.C. § 1229a(c)(7)(C)(i)(2009); 8 C.F.R. § 1003.2(c)(2) (2009). It then found that Dat's motion to reopen was not exempt from the ninety-day time-bar because none of the evidence Dat submitted in support of his motion showed that conditions had materially changed in Guyana. Id. at 2-3; see 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii). Specifically, the BIA found that the articles Dat submitted documented attacks against two villages and several attacks against the police, but provided no clear motive for those attacks. Id. at 2-3. Although the Guyanese president had speculated that some attacks were intended to stir up racial tensions, other reports suggested that the attacks were gang-related and based on personal vendettas. Id. at 3. In sum, there was no evidence that the attacks were anything other than criminal actions or that they were focused against Indo-Guyanese. Id. The BIA further found that the articles demonstrated that tension between the Afro- and Indo-Guyanese populations had existed for years. Because racial hostility in Guyana "clearly pre-dated [Dat's] hearing," it did not constitute a "new" or "changed" condition. Id. With respect to Dat's request that the proceedings be administratively closed, the BIA found that Dat "ha[d] an administratively final order of removal, with no proceedings pending before either the Board or the

7

Immigration Judge" and stated that it "will not reopen proceedings that are final solely to administratively close them." Id. at 2. The BIA denied Dat's motion to reopen as well as his requests for a stay of removal and administrative closure of the proceedings. Id. at 3. This petition for review followed.

## II. DISCUSSION

We review the BIA's denial of a motion to reopen removal proceedings for an abuse of discretion. Zhang v. U.S. Att'y Gen., 572 F.3d 1316, 1319 (11th Cir. 2009) (per curiam). Under this deferential standard, "[our] review is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner." Id. Motions to reopen are disfavored, especially in removal proceedings, and thus the moving party bears a heavy burden. Id.

Dat argues that the BIA erred in failing to reopen the removal proceedings because he has demonstrated "changed country conditions" and, alternatively, because his marriage to a United States citizen entitles him to an adjustment of status as determined by an IJ. We disagree.

As a threshold matter, Dat has cited no binding authority in support of his argument that he is entitled to have his case reopened based upon his marriage and subsequent application for adjustment of status. An IJ lacks jurisdiction to adjudicate an adjustment of status claim filed by an arriving alien who is placed in removal proceedings *unless:* (1) the alien filed the adjustment of status application

8

with USCIS; (2) the alien left the United States and returned pursuant to a grant of advance parole; (3) the alien's adjustment of status was denied by USCIS; and (4) the alien was placed in removal proceedings either upon his return to the United States pursuant to the grant of advance parole or after USCIS denied the application. 8 C.F.R. § 1245.2(a)(1)(ii) (2009). Dat has not shown that he meets these requirements. Moreover, even assuming an IJ would have jurisdiction to adjudicate Dat's adjustment of status claim, we fail to see how that entitles him to a reopening of his removal proceedings under 8 U.S.C. § 1229a(c)(7).

The BIA also did not abuse its discretion in finding that reopening was not warranted based on changed circumstances. Although a motion to reopen must be filed within ninety days after the final order of removal is entered, this time-bar does not apply where the alien presents material evidence of changed country conditions that "was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii). The evidence Dat presented, which included articles reporting on a mass murder in a largely Indian village, attacks against Indo-Guyanese, a gang attack on a police station, and a general increase in crime, does not demonstrate heightened race-based violence against Indo-Guyanese. As the BIA pointed out, the reports suggest that the attacks were the product of generalized violence and were not focused against the Indo-Guyanese. Moreover, none of the reports indicate that racial

9

tensions between the Afro- and Indo-Guyanese are any worse now than they were in 2006. In fact, the 2008 country report made no mention of race-related persecution and noted that tensions between Indo- and Afro-Guyanese had "diminished." Id. at 72. In short, the documents Dat submitted in support of his motion to reopen, though not previously available, reflect either no change, or indeed some improvement, in racial and ethnic tensions in Guyana. Accordingly, the BIA did not err in denying Dat's motion to reopen removal proceedings based on changed conditions in Guyana.

### III. CONCLUSION

Dat petitions us for review of the BIA's denial of his motion to reopen his removal proceedings. For the foregoing reasons, we DENY the petition.

**PETITION DENIED.**

10